IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No.  05-cv-01533-MJW-CBS**

BETTY J. PINKERTON,

Plaintiff,

v.

COLORADO DEPARTMENT OF TRANSPORTATION,

Defendant.

---

**ORDER REGARDING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Docket No. 50)**

---

**MICHAEL J. WATANABE
United States Magistrate Judge**


This case was referred to the undersigned upon consent of the parties for all

further proceedings pursuant to 28 U.S.C. § 636(c).  (Docket Nos. 40, 41).

Plaintiff, Betty Pinkerton, was employed by the defendant, the Colorado

Department of Transportation ("CDOT"), from April 1995 until her termination on

March 27, 2003.  In her Amended Complaint (Docket No. 18), plaintiff raises two claims

for relief, namely, sexual harassment and retaliation under Title VII of the Civil Rights

Act of 1964.  She seeks declaratory, injunctive, and monetary relief.

Now before the court is the defendant's motion for summary judgment (Docket

No. 50) and its memorandum of law and exhibits in support thereof (Docket Nos. 51

and 52).  Plaintiff filed a response and supporting exhibits (Docket No. 65).  Defendant

then filed a reply and supporting exhibits (Docket No. 70).  The court has carefully

reviewed the motion papers and the case file and has considered applicable Federal

Rules of Civil Procedure and case law.  The court now being fully informed makes the

following findings, conclusions, and order that the motion for summary judgment be

granted.

Rule 56(c) provides that summary judgment shall be granted "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A

party seeking summary judgment bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions of the pleadings,

depositions, interrogatories, and admissions on file together with affidavits, if any,

which it believes demonstrate the absence of genuine issues for trial."  Robertson v.

Board of County Comm'rs of the County of Morgan, 78 F. Supp.2d 1142, 1146 (D. Colo.

1999) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Mares v. ConAgra

Poultry Co., 971 F.2d 492, 494 (10th Cir. 1992)).  Defendant here has done so.

"Once a properly supported summary judgment motion is made, the opposing

party may not rest on the allegations contained in the complaint, but must respond with

specific facts showing the existence of a genuine factual issue to be tried. . . .  These

facts may be shown 'by any of the kinds of evidentiary materials listed in Rule 56(c),

except the mere pleadings by themselves.'"  Southway v. Central Bank of Nigeria, 149

F. Supp.2d 1268, 1273 (D. Colo. 2001), aff'd, 328 F.3d 1267 (10th Cir. 2003).  However,

"[i]n order to survive summary judgment, the content of the evidence that the nonmoving party points to must be *admissible.* . . .  The nonmoving party does not have to produce evidence in a form that would be admissible at trial, but '"the content or substance of the evidence must be admissible."' . . .  Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because 'a third party's description of a witness' supposed testimony is "not suitable grist for the summary judgment mill."'" Adams v. American Guarantee & Liability Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000).  See Wright-Simmons v. City of Oklahoma City, 155 F.3d 1264, 1268 (10th Cir. 1998).

"Summary judgment is also appropriate when the court concludes that no reasonable juror could find for the non-moving party based on the evidence presented in the motion and response." Southway, 149 F. Supp.2d at 1273.  "The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. . . . Unsupported allegations without 'any significant probative evidence tending to support the complaint' are insufficient . . . as are conclusory assertions that factual disputes exist." Id.; Robertson, 78 F. Supp.2d at 1146 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); quoting White v. York Int'l Corp., 45 F.3d 357, 360 (10th Cir. 1995)).  "Evidence presented must be based on more than 'mere speculation, conjecture, or surmise' to defeat a motion for summary judgment." Southway, 149 F. Supp.2d at 1274.  "Summary judgment should not enter if, viewing the evidence in a light most favorable to the non-moving party and drawing all reasonable inferences in

4

that party's favor, a reasonable jury could return a verdict for that party." Id. at 1273.

**VICARIOUS LIABILITY**

Pursuant to Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  "If a plaintiff proves that 'discrimination based on sex has created a hostile or abusive work environment,' she has established a violation of Title VII. . . .  To constitute actionable sexual harassment, a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' . . . and that the victim was targeted 'because of her gender . . . .'" EEOC v. PVNF, L.L.C., 487 F.3d 790, 797 (10th Cir. 2007) (citations omitted).

"Employers are not automatically liable for hostile work environment sexual harassment perpetrated by their employees." Curran v. AMI Fireplace Co. Inc., 163 Fed. Appx. 714, 719 (10th Cir. Jan. 19, 2006) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998)).  "If the perpetrator of the hostile work environment sexual harassment is a supervisor with immediate or successively higher authority over the plaintiff, a plaintiff can establish vicarious liability on the part of the employer in one of two ways." Id.  "First, a plaintiff can demonstrate that the supervisor's behavior 'culminate[d] in a tangible employment action' against the plaintiff (e.g., discharge, demotion, or undesirable reassignment)."

Id. (quoting Ellerth, 524 U.S. at 765)).  Under those circumstances, no affirmative

defense is available, and the employer is vicariously liable for the supervisor's

behavior.  Id.  "Second, even absent a tangible employment action, an employer will

still be liable for a hostile work environment created by one of its supervisory

employees unless it proves, by a preponderance of the evidence, a two-pronged

affirmative defense: (1) it 'exercised reasonable care to prevent and correct promptly

any sexually harassing behavior,' and (2) 'the plaintiff employee unreasonably failed to

take advantage of any preventive or corrective opportunities provided by the employer

or to avoid harm otherwise.'"  Id. (quoting Ellerth, 524 U.S. at 765).

**Tangible Employment Action**

Plaintiff contends that the sexual harassment by her supervisor, David Martinez,

culminated in her poor evaluations and ultimately her termination, both of which are

"tangible employment actions."  The court, however, finds that the undisputed evidence

shows that the purported harassment did not culminate in either the poor evaluations or

the termination.  While plaintiff claims that Martinez admitted he was filing evaluations

with supervisors at the same time he was harassing her, defendant correctly notes that

Martinez made no such admission.  Instead, during his deposition, Martinez admitted

that he sexually harassed plaintiff during December 2002, and the undisputed evidence

is that plaintiff received poor evaluations and progress reports from Martinez before

that time, namely, between August 2000 and October 2002.  Martinez's inappropriate

comments followed in December 2002 into February 2003.  As noted by defendants,

the last of Martinez's poor evaluations happened two months before the first

6

inappropriate conduct.  Plaintiff admitted during her deposition that she knew her job

was in jeopardy even before the sexual harassment.  (Def.'s Ex. A at 213; Docket No.

51-2 at 66).

In fact, the undisputed evidence shows that plaintiff's performance over the

years was consistently far from stellar, and she was already well on her way toward

disciplinary action, including termination, before the alleged harassment began.  The

undisputed evidence shows that plaintiff's performance problems go way back to her

employment at Colorado State University.  Plaintiff admits that her supervisor at that

job, Lauri Gail Jones, thought plaintiff needed improvement in prioritizing tasks,

complying with deadlines, and interacting with staff.  (Def.'s Ex. A at 40, Docket No. 51-

2).  In fact, Jones' over-all rating of plaintiff equated to "needs improvement," and Jones

rated the plaintiff's performance as "unacceptable" on ten sub-factors, including

meeting a level of quality and timeliness for the assignment or duty, meeting deadlines,

identifying potential and real problems, obtaining facts before making decision,

considering or generating options to solve problems, and assuring decisions were

made at the appropriate level.  (Def.'s Ex. A at 42; Ex. B, Docket No. 51-3).  Jones also

rated plaintiff's performances as "needs improvement" in nine areas, including

knowledge of established policies and procedures and communicating in a well-

organized, courteous, effective manner with staff and students.  (Def.'s Ex. A at 46).

Furthermore, Jones gave plaintiff a corrective action with a July 31, 1995, deadline by

which plaintiff was to correct her deficiencies.  (Def.'s Ex. C, Docket No. 51-4; Ex. A, at

48).  Plaintiff started to look for another job and ultimately did not complete the

corrective action.  She applied for a job with defendant, and in the application documents she misidentified her CSU supervisor and failed to include Jones' name in the section asking for work history.  Plaintiff testified that she feared Jones would give defendant a negative reference.  (Def.'s Ex. A at 52).

Even without consideration of plaintiff's performance at that other state job, the undisputed evidence is that she had similar performance issues during her employment at CDOT.  Plaintiff's first CDOT supervisor, Resident Engineer Scott Ellis, similarly observed problems with the quality and timeliness of plaintiff's work and her interactions with other office personnel.  (Def.'s Ex. G at 9, Docket No. 51-8).  More specifically, he testified that they had a big problem with credit card and dollar amounts being incorrectly entered into financial reports, that plaintiff was often incorrect even doing her own leave slips, and that on phone messages, she wrote down the wrong phone numbers.  (Def.'s Ex. G at 7).  In addition, he related problems plaintiff had with interpersonal relationships.  For example, he noted that once somebody either questioned her or did not like the quality of her work, or there were errors in her work, plaintiff was frequently thereafter less helpful to that person and was very defensive (Def.'s Ex. G at 10, 11, 13).  Therefore, the employees would go to Ellis.  After Ellis was no longer plaintiff's supervisor, he experienced the same type of reaction, i.e., he would ask plaintiff for a report or copies, and she would not do them, and Ellis would then have to go to plaintiff's supervisor and ask him.  He saw a big decrease in how cooperative and helpful she was. (Def.'s Ex. G at 14, 15-16).  Plaintiff admitted during her deposition that there were also a couple of engineers who complained about her

8

performance.  (Def.'s Ex. A, Docket No. 51-2 at 47-48).

While Ellis' over-all written evaluation of plaintiff for October 1995 to October

1996 was "good," he rated her as "needs improvement" in numerous (22) areas.[1]

(Def.'s Ex. H, Docket No. 51-9).   The narrative portion of the evaluation included

comments that vender payments had been delayed, partially due to problems plaintiff

had submitting payments through the DAP system; that DAP reports were regularly

submitted with incorrect coding and incorrect dollar amounts; that her mistakes were

often repeated, and she needed to take responsibility for the mistakes she makes; that

documentation was often placed in the wrong file; that she needed to work on

prioritizing her work; that phone messages were sometimes inaccurate or misdirected;

that she had "strained relations with some in the office;" that she needed to be

_____

[1]Namely, maintaining quality and quantity service standards; conducting adequate inspections for quality control and work completion; maintaining currency on changes, updates, and improvements; applying professional/technical procedures in doing the job; meeting a level of quality for the assignment or duty; identifying and defining potential and real problems; obtaining facts before making decisions; seeking input from others when appropriate; considering and/or generated options to solve problems; maintaining records, forms and/or documents; coordinating with others to establish and implement plans; maintaining flexibility to meet change; possessing knowledge of established policies and procedures; communicating orally in a well-organized, courteous, and effective manner; maintaining smooth working relations, support, and respect of others; demonstrating tact and diplomacy in negotiations or confrontations with others; maintaining sensitivity to the feelings and efforts of others; contributing to maintaining the level of employee morale and motivation; gaining cooperation from others when necessary; accessibility to others and responsive to their questions, needs, and concerns; looking at internal work processes and recommending or implementing improvements; making or suggesting changes to be more responsive to the needs of various customers; dedicating time to learn more about quality management; using computers to accomplish assigned tasks; and seeking opportunities to improve level of skill.  (Docket No. 51-9).

responsive to the needs and concerns when someone requested assistance; and that she needed to be considerate of others' workloads.  (Def.'s Ex. H).

In the next year's evaluation, Ellis once again rated numerous areas (18) as "needs improvement," only four fewer areas than the year before.  (Def.'s Ex. I, Docket No. 51-10).  Plaintiff's over-all score for the year increased only slightly (4 points out of 500).  In the narrative portion of the report, Ellis commented that plaintiff's "quality of work is improving.  The number of errors encountered on her work has decreased during the past year.  **However, the errors are still fairly frequent and there still needs to be improvement**."  (Docket No. 51-10 at 7) (emphasis added).  He listed specific examples of work that contained errors.

For the next two years, plaintiff's performance reportedly improved.  (Def.'s Ex. J, Docket No. 51-11).  She had just two "needs improvement" areas in the October 1997 through June 1998 report, both of which were in areas of meeting schedules and deadlines.  (Docket No. 51-11 at 2).

The evaluation form for July 1998 through June 1999 was different, and provided rating options of just "peak performer," "fully competent," and "needs improvement."  Overall, plaintiff was rated as "fully competent," but the narrative portion included notes about the length of time it took her to enter a certain report, that she frequently submitted phone messages and DAP reports that were incorrect or incomplete, and that she needed to make more of an effort to improve working relations and respect for others.  (Def.'s Ex. K, Docket No. 51-12).  The narrative for the next year similarly reported projects not always being completed in a timely manner and that

10

she still needed to make more of an effort to improve working relations with some of her co-workers and respect for others.  (Def.'s Ex. L, Docket No. 51-13).

In July 2000, after a mediation between plaintiff and Ellis, plaintiff's position was upgraded from an Administrative Assistant II ("AA II") to an Administrative Assistant III ("AA III"), not based upon her performance but based upon job duties.[2]  Plaintiff understood that she was to take on the duties of an AA III and agreed that she would meet with her supervisor and the EEO/Civil Rights Manager for the region, Wendy Miller.  The following month, Ellis' new supervisor, Richard Gabel (Program Engineer for the Loveland Residency), reassigned plaintiff's supervision to the other Resident Engineer, David Martinez.  Plaintiff was happy about the reassignment.  (Def.'s Ex. A, Docket No. 51-2 at 38).  After the change, however, Ellis observed a big decrease in the plaintiff's performance and level of her cooperation.  (Def.'s Ex. G at 44-45, Docket No. 51-8).

Plaintiff had progress meetings on August 21, September 12, and September 29, 2000.  (Def.'s Ex. Q, R, and S, Docket Nos. 51-18 to 51-51-20).  Notes from the first meeting reflect a number of performance issues, similar to those reported in the past, i.e., willingness to do requested work, attitude/cooperation, prioritizing work assignments, notes and e-mails not well-organized, lacking an understanding of e-mail system, grammar skills, unfamiliarity with purchasing rules.   (Def.'s Ex. Q, Docket No. 51-18).  During her deposition, plaintiff admitted that there was a problem with a co-

---

[2]Two years before, Ellis would not sign a form upgrading the position (a PDQ) because he did not believe plaintiff was doing the work of an AA III.

worker named in the notes and that the co-worker gave feedback to Martinez.  (Def.'s

Ex. A at ).  The notes also mentioned that some employees had the sense that plaintiff

had a poor attitude and gave the impression that she did not want to do their work.  In

addition, Martinez noted his suggestion that plaintiff take a grammar course, and

plaintiff admitted during her deposition that she has problems with grammar.  (Def.'s Ex.

A at 104, Docket No. 51-2).  Martinez also reported that Ellis encountered problems

with plaintiff's performance of some transactions and purchases, which did not follow

proper procedures.  (Def.'s Ex. Q, Docket No. 51-18).  Also, plaintiff did not follow steps

requested by Ellis with regard to a new hire.  The notes of the next meeting, on

September 12, 2000, reflect improvement in some areas, but continued problems in

others.  (Def.'s Ex. R, Docket No. 51-19).  In the next report, from September 29, 2000,

problems were reported with regard to following up on job duties, accuracy of work,

insubordination, inability to learn new duties, and time management.  (Def.'s Ex. S,

Docket No. 51-20).

Based on these progress reports, Martinez's supervisor, Gabel, scheduled an R-

6-10 meeting, which was not a formal hearing but an opportunity to meet and exchange

information so facts may be determined.  (Def.'s Ex. T, Docket No. 51-21).  Gabel

stated in a letter to plaintiff that he had "been informed that you may have repeatedly

failed to carry out certain job duties in a satisfactory manner.  I am further concerned

that you may have violated our overtime policy by incurring overtime in the absence of

your supervisor's approval."  (Def.'s Ex. T).  Following that meeting  on October 4,

2000, which was attended by plaintiff, Gabel, Martinez, and Miller, Gabel issued a

12

written corrective action after finding that plaintiff "did fail to carry out certain job duties in a satisfactory manner and, [plaintiff] did fail to carry out [her] supervisor's direct order by incurring overtime without [her] supervisor's permission." (Def.'s Ex. U, Docket No. 51-22). That corrective action listed five very specific areas of improvement and required Martinez to prepare a report in December 2000 concerning plaintiff's compliance. (Def.'s Ex. U). Plaintiff was warned in that corrective action that "[f]ailure to carry out the above corrective measures will result in further corrective and/or disciplinary action, up to and including termination." (Def.'s Ex. U).

Martinez submitted a very detailed summary of plaintiff's job performance from October 17 to December 15, 2000, with documentation of plaintiff's failure to show adequate improvement relative to three of the five corrective measures. He stated therein:

> She continues to require unreasonable amounts of direction from both of the Resident Engineers and most of the Project Managers concerning daily tasks. The Engineering Staff must routinely follow up to assure that Betty accurately completes her tasks. She also requires an unreasonable amount of supervision in prioritizing and managing her daily work. The situations listed below demonstrate Betty's non-compliance with the terms of the corrective action. It would appear that she lacks the ability to perform more than one task at a time, at an acceptable, consistent level as needed over time. Too many of the tasks she does complete contain mistakes and errors and subsequently need to be redone.
>
> During this period of evaluation, I have received several complaints from other employees that Betty does not listen well and does not appear to comprehend basic routine work assignments. . . .

(Def.'s Ex. V, Docket No. 51-23).

Based upon that report, in a memo dated January 10, 2001, Gabel asked his

supervisor, Karla Harding, to convene an R-6-10 meeting to determine whether

disciplinary or corrective action was required to address plaintiff's non-performance of

duties.  (Def.'s Ex. W, Docket No. 51-24).  Harding then set such a meeting for April 2,

2001.  (Def.'s Ex. X, Docket No. 51-25).

Plaintiff's written evaluation for August 1, 2000, to May 1, 2001, the eight months

she had been working as an AA III, had an overall performance rating of "needs

improvement."  (Def.'s Ex. Y, Docket No. 51-26).  She also received such a rating in the

following areas: professional/technical (which included quality, quantity, and timeliness

and communications), people skills, and administration (including organizing and

coordinating, problem analysis and decision making, and diversity).  The narrative

portion of the report includes comments that

> she continues to require a lot of direction in making an assignment clear
> and concise.  The preparation of tasks and documents are not always
> complete and effective.  She has difficulty communicating in writing in a
> well-organized and effective manner. i.e. emails, office memos and phone
> messages.
>
> . . . it is the lack of quality and timeliness of the request/service that
> renders it ineffective.  I have receive several complaints that Betty does
> not listen well and does not appear to comprehend basic routine work
> assignments, which the employees ask of her.
>
> Betty should make more of an effort to improve working relations with
> some of her co-workers in the office.  There is not smooth working
> relations and support with a few of the employees.  Betty needs to work
> on her tact and diplomacy in daily interactions with other employees.
> During conflicts or confrontations with others, she is perceived as
> defensive or unwilling to go to the extra effort to solve the problem.
> . . .
>
> Betty continues to have difficulty setting priorities, holding schedules and
> making deadlines.  If the task is very simple and minor in nature, then

14

Betty has no problem completing the task.  She has a difficult time maintaining flexibility in responding to changing assignments and special requests.  She continues to require an unreasonable amount of direction and time from both Resident Engineers and most of the engineering staff concerning daily tasks.  As a result, most of the important items are not done on time and are often taken down to the very minute.

Betty has difficulty identifying current and potential problems concerning her daily tasks and then resolving the problems in a timely manner.  She does a limited amount of research when analyzing facts and seeks a limited amount of input from others when making decisions.  It seems very difficult for her to make decisions on her own when asked to do so.  I have worked with her to clarify what she can do to limit the number of mistakes in her work; however, over the past 8-9 months I have not seen any improvement.  Betty continues to have problems with accuracy and timeliness with vehicle reports, time sheets and credit card packages.  I work with her, weekly and sometimes daily, correcting and giving her feedback in redoing the work.

(Def.'s Ex. Y, Docket No. 51-26).

Following the R-6-12 meeting on April 16, 2001, Harding sent a letter dated May 9, 2001, to plaintiff, giving notice that Harding decided to demote plaintiff from AA III back to AA II.  (Def.'s Ex. Z, Docket No. 51-27).  Harding concluded that plaintiff was not able or willing to make the improvements expected of her by her supervisors and noted that during that meeting, plaintiff "did not provide sufficient evidence that would explain [plaintiff's] performance problems or contradict the information [her] supervisor provided to [Harding]. [Plaintiff] mostly indicated that [she] disagree[d] with, or even resent[ed] [her] past and present supervisors' priorities and instructions and have trouble keeping up with the additional work associated with the [AA] III PDQ." (Docket No. 51-27 at 2).

Plaintiff filed a grievance (Def.'s Ex. AA, Docket No. 51-28) to the State

Personnel Board.  The case had been set for hearing before an Administrative Law

Judge, but the parties reached a settlement agreement in which the parties agreed that

the plaintiff's Individual Performance Objectives (IPOs) would be based on the duties

set forth in a September 7, 2001, memo from Martinez and would be used as the basis

for plaintiff's future evaluations.  (Def.'s Ex. CC, Docket No. 51-30 at 2).  The parties

further agreed that the plaintiff would be allowed a certain number of errors per month

in different categories and would have monthly progress reviews as to whether she had

an agreeable number of errors.  (Def.'s Ex. A at 143-44).  Plaintiff was in full agreement

with that plan.  (Def.'s Ex. A at 143-44).

Plaintiff had progress meetings in February and March 2002 during which

Martinez had written documentation of each of plaintiff's errors, the total of which

exceeded the numbers to which plaintiff agreed to adhere.  (Def.'s Ex. DD and EE,

Docket Nos. 51-31 and 51-32).  Plaintiff admits that Martinez had written

documentation of each error.  (Def.'s Ex. A at 143, 181).  On April 22, 2002, Martinez

issued an overall performance rating of "needs improvement" for the time period of May

10, 2001, to April 30, 2002.  (Def.'s Ex. FF, Docket No. 51-35).  As a result, Gabel sent

a memo to Harding dated April 24, 2002, in which he requested that Harding give

plaintiff a corrective action for her non-performance of duties.  (Def.'s Ex. GG, Docket

No. 51-36).  Martinez then documented plaintiff's errors in April 2002, which yet again

exceeded the number of errors to which plaintiff had agreed.  (Def.'s Ex. HH, Docket

No. 51-37).

Plaintiff then filed a grievance concerning her performance rating (Def.'s Ex. II,

Docket No. 51-40), which was denied by Gabel following a meeting with plaintiff and Miller.[3] (Def.'s Ex. II, JJ; Docket Nos. 51-40 and 51-41). Furthermore, Gabel issued a corrective action as a result of the recent "needs improvement rating." (Def.'s Ex. KK, Docket No. 51-42). Plaintiff was given four months to improve her performance in accordance with the prior settlement agreement. (Def.'s Ex. KK).

Progress reviews were held with plaintiff by Miller and Martinez in June, July, August, and September 2002. Documentation shows that during those months, plaintiff's errors exceeded the number allowed in at least three of the five IPO's outlined in the settlement agreement (Def.'s Ex. LL, MM, NN, and OO, Docket Nos. 52-2 to 52-14). During her deposition, plaintiff admitted that the errors in the progress reviews were always supported with documentation and that she understood that she had four months to improve her performance. (Def.'s Ex. A at 181).

On October 15, 2002, as required by the corrective action plan, Martinez sent Gabel a memorandum concerning the plaintiff's job performance which included a tabulation of the plaintiff's errors between June 25 and October 15, 2002. (Def.'s Ex. PP, Docket No. 52-15). Martinez stated that

> [d]uring this corrective action period, [plaintiff] has not shown adequate improvement in reducing the number of errors in all Levels of Priority as described in the performance plan. The numbers show that [she] continues to fail in meeting the minimum requirements for IPO's A, B, D and E.
>
> She continues to require unreasonable amounts of direction from both of the Resident Engineers and some of the Project Managers concerning

---

[3]Plaintiff's memo to Martinez concerning her "[e]xplanation of disagreement" itself contains several errors. (Def.'s Ex. II, Docket No. 51-40).

daily tasks.  The Engineering Staff must routinely follow up to assure that [plaintiff] accurately completes her tasks.  She also requires an unreasonable amount of supervision in prioritizing and managing her daily work.  The backup documentation attached demonstrates [plaintiff's] non-compliance with the terms of the corrective action.  It still would appear that she lacks the ability to perform more than one task at a time, at an acceptable, consistent level as needed over time.  Too many of the tasks she does complete contains mistakes and errors and subsequently needs to be redone.

(Def.'s Ex. PP, Docket No. 52-15).

In late October or early November 2002, plaintiff requested a meeting with Gabel and Miller because she knew her job was in jeopardy.  (Def.'s Ex. A at 183-85).  That meeting was held on November 7, 2002, and the issue discussed was that plaintiff "needs more time to find other employment."   (Def.'s Ex. A at 184-85).  Gabel told plaintiff that at that time he was not in a hurry to act on Martinez's evaluation, and he acquiesced in plaintiff's requests that she have more time because she wanted to buy some PERA time and wanted to look for another job.  (Def.'s Ex. A at 186-87).  Gabel also talked about possibly finding plaintiff another job, and plaintiff said she would be willing to go to Denver or Brush.  (Def.'s Ex. A at 187).  It was not until after this meeting that the purported sexual harassment by Martinez began.

Gabel and Harding attempted to find plaintiff another job.  (Def.'s Ex. A at 187-88).  Plaintiff was given administrative leave, which is with pay, to go on job interviews.  (Def.'s Ex. A at 189).  On February 11 and 19, 2003, plaintiff went to Denver to look at a Staff Traffic data entry position Harding found for her, and plaintiff sat in and tried the job.  (Def.'s Ex. A at 189-90).  It was explained to her that it would be a temporary assignment, which if it worked out, would be a full-time position.  (Def.'s Ex. A at 194).

18

Harding testified at her deposition that the job in Denver was not temporary; it was going to be for a trial period.  If it did not work out, then plaintiff would return to Loveland.  (Def.'s Ex. N at 78, Docket No. 51-15 at 6).

On the second day that plaintiff went to Denver to look at that position, February 19, 2003, plaintiff telephoned Eugene Trujillo, who administered CDOT's civil rights programs, and claimed that Martinez was sexually harassing her.  This was the first person plaintiff spoke to in CDOT management about Martinez's comments.  (Def.'s Ex. A at 197, Docket No. 51-2 at 64).  Plaintiff had not informed Miller (the region's EEO Officer), Gabel, or Harding that Martinez had allegedly been sexually harassing or discriminating against her.  (Def.'s Ex. A at 203, Docket No. 51-2 at 65).  Plaintiff filed a written complaint in a memo to Trujillo dated February 24, 2003.[4]  (Def.'s Ex. RR, Docket No. 52-17).  On February 26, 2003, the Director of CDOT Human Resources, Celina Benevidez, notified Harding that a sexual harassment complaint had been filed

_____

[4]In that memo, plaintiff relates the remarks purportedly made by Martinez.  The first was not until December 2002 during a project ride when Martinez asked, "What does a divorced 52 yr. Lady do when she gets sexual urges."  (Docket No. 52-17). According to plaintiff's memo, the next remark was on January 6, 2003, when Martinez asked if a man who walked by plaintiff's office had the "hots" for plaintiff, and Martinez then asked plaintiff her breast size.  (Docket No. 52-17).  A few days later, Martinez allegedly commented on clothes that he like to see plaintiff wear.  (Docket No. 52-17). Toward the end of that week, he wanted to tell plaintiff a story about a beautiful married woman in Greeley, but plaintiff told him she did not care to hear about it.  (Docket No. 52-17).  Another day, Martinez wanted plaintiff to go to his office to review work-related matters, and when he was getting up to close his door, plaintiff felt uncomfortable and asked him to keep the door open.  (Docket No. 52-17).  Finally, according to plaintiff, the last thing that happened, which was the week before she wrote the memo to Trujillo, Martinez said he thought it would be nice to have lunch at plaintiff's house. (Docket No. 52-17).

and was under investigation by Headquarters EEO Office.  Harding decided to have

CDOT Headquarters investigate plaintiff's complaint.  (Def.'s Ex. D, ¶ 4).

Thereafter, on February 28, 2003, Gabel and Miller met with plaintiff to discuss

her decision regarding the reassignment to Denver.  Plaintiff told them it was no longer

necessary for her to seek another job because "everything was now fine" with her

Loveland job.  (Def.'s Ex. A at 217, Docket No. 51-2 at 67).  Plaintiff testified that "[t]he

reason I said I was fine here, everything's okay, because I was buying time.  Because I

knew that there was an investigation going on, so I had to do what I had to do."  (Def.'s

Ex. A at 217).  She never told them about the sexual harassment by Martinez, and they

were sort of surprised when she refused the Denver position.  (Def.'s Ex. A at 218).  In

fact, in an e-mail on February 28, 2003, Gabel asked plaintiff to confirm that she did not

want the Denver position.  (Def.'s Ex. A at 218; Docket 52-18).  Despite previously

telling Gabel that she would be willing to go to Denver or Brush for another job (Def.'s

Ex. A at 187), plaintiff responded on March 3, 2003, that she could not afford to travel

back and forth for a temporary assignment.  (Docket No. 52-18).

As a result, Gabel formally requested possible corrective or disciplinary action.

(Def.'s Ex. YY, Docket No. 70-3).  Therefore, on March 10, 2003, Harding sent plaintiff

a letter, scheduling another R-6-10 meeting with plaintiff, noting that Harding had been

informed that plaintiff had made insufficient progress toward achieving compliance with

the terms of the corrective action plaintiff received on or about June 25, 2002.  In

particular, Harding noted that it was alleged that plaintiff had not adequately reduced

the number of errors she made per month.  (Docket No. 52-19).  Plaintiff never claimed

20

during that R-6-10 meeting with Harding that the reason she had poor performance evaluations from Martinez was in anticipation of Martinez later sexually harassing her. (Def.'s Ex. A at 227).

On March 18, 2003, Harding learned from Headquarter's EEO Office that plaintiff's sexual harassment complaint might be justified, and she thus called Martinez, Gabel, Ellis, Miller, and plaintiff to notify them that she was removing Martinez as plaintiff's supervisor, effective immediately, and plaintiff's supervision was reassigned back to Ellis.  (Def.'s Ex. YY, Docket No. 70-3 at 2).  Three days later, Harding learned that Headquarters EEO Office found that Martinez had violated CDOT's Sexual Harassment Policy Directive by having inappropriate, sexually explicit conversations with the plaintiff over a course of two months, from late December 2002 to mid-February 2003.  (Def.'s Ex. UU, Docket No. 52-20).

In a letter to plaintiff dated March 27, 2003, Harding advised plaintiff that plaintiff's employment would be terminated effective the following day, essentially for failing to improve her performance.  (Def.'s Ex. VV, Docket No. 52-21).  Harding, not Martinez, made the termination decision.  (Def.'s Ex. VV, Docket No. 52-21).  Harding stated that she specifically considered only the corrective action period (plaintiff's performance leading up to October 2002) and did not consider any reports after October 15, 2002, which was well before the alleged sexual harassment.  (Def.'s Ex. AAA, Docket No. 70-5).

In sum, the court finds that the undisputed evidence shows that the purported harassment by Martinez did not culminate in either the poor evaluations of the plaintiff

or her termination.  Harding, not Martinez, made the decision to terminate plaintiff.

Each and every one of plaintiff's state supervisors had similar, consistent criticisms of

the plaintiff's work performance.  Plaintiff's settlement agreement allowed only a certain

number of errors, which she exceeded.  Those errors, which were reported by Martinez,

were well-supported by documentation, and many of them were reported to Martinez by

other employees.  Martinez's reports documenting these errors were written well before

any purported sexual harassment began.  Plaintiff was already well on her way toward

termination prior to any alleged sexual harassment.

### Two-Pronged Affirmative Defense

As noted above, even absent a tangible employment action, an employer will still

be liable for a hostile work environment created by one of its supervisory employees

unless it proves, by a preponderance of the evidence, a two-pronged affirmative

defense: (1) it exercised reasonable care to prevent and correct promptly any sexually

harassing behavior, and (2) the plaintiff employee unreasonably failed to take

advantage of any preventive or corrective opportunities provided by the employer or to

avoid harm otherwise.

In this case, in its summary judgment motion papers, defendant described its

sexual harassment policy and training.  (See Docket No. 51 at 18-19; Def.'s Ex. F).  As

defendant correctly notes in its reply (Docket No. 70 at 25), plaintiff did not address the

policy or training in her response and thus has conceded that the policy and training

demonstrate reasonable care to prevent and correct promptly any sexually harassing

behavior in the workplace.  Plaintiff acknowledged that she read the defendant's sexual

22

harassment policy.  (Def.'s Ex. F, Docket No. 51-7).  Nevertheless, plaintiff did not avail

herself of the defendant's procedures while she was allegedly being sexually harassed

between December 2002 and February 2003, even though she was in frequent contact

with Miller and Gabel about her performance issues.

Furthermore, once plaintiff finally complained to Trujillo at CDOT headquarters,

he investigated her complaint fully and issued a report.  (Def.'s Ex. UU).  Once Harding

learned from headquarter's EEO Office that plaintiff's sexual harassment complaint

might be justified, she immediately called Martinez, Gabel, Ellis, Miller, and plaintiff to

notify them that she was removing Martinez as plaintiff's supervisor, effective

immediately, and plaintiff's supervision was reassigned back to Ellis.  (Def.'s Ex. YY,

Docket No. 70-3 at 2).  Furthermore, the undisputed evidence is that Martinez did not

harass plaintiff after she complained to Trujillo.  (See Def.'s Ex. XX at 206, Docket No.

70-2 at 48).  According to plaintiff, Martinez's last inappropriate comment was the week

before February 21, 2003.  (Def.'s Ex. A at 225).  Harding subsequently held an R-6-10

meeting with Martinez, determined that Martinez had violated the sexual harassment

policy, and administered disciplinary action, including a demotion and reduction in pay.

(Def.'s Ex. WW, Docket No. 52-22).[5]  The undisputed evidence establishes that

defendant took prompt remedial action.

Despite being familiar with CDOT's anti-harassment policies and procedures,

---

[5]On April 7, 2003, Harding demoted Martinez, which resulted in a salary
reduction of approximately $1160 per month, reassigned him to the Region 4 Traffic
Section, required him to take a class on sexual harassment, and encouraged him to
continue the counseling he had started.  (Def.'s Ex. N, WW).

plaintiff waited about two months after Martinez's alleged first inappropriate conduct to

complain to Trujillo.  Given the absence of an adequate explanation for this delay,

plaintiff's inaction constitutes an unreasonable failure to take advantage of any

preventive or corrective opportunities provided by CDOT or to avoid harm otherwise.

Therefore, defendant correctly asserts that it has met the second prong of the

affirmative defense and is entitled to summary judgment on plaintiff's hostile work

environment claim.  See Faragher, 524 U.S. at 778 ("[W]hile proof that an employee

failed to fulfill the corresponding obligation of reasonable care to avoid harm is not

limited to showing any reasonable failure to use any complaint procedure provided by

the employer, a demonstration of such failure will normally suffice to satisfy the

employer's burden under the second element of the defense."); Conatzer v. Medical

Prof. Buldg. Serv.'s Corp., 95 Fed.Appx. 276, 281 (10th Cir. 2004) (delay of three weeks

from the first incident was an unreasonable failure to act); Uragami v. Home Depot

USA, Inc., 2005 WL 2177232 (D. Utah Sept. 2, 2005) (six-month delay unreasonable).

In sum, the court concludes that plaintiff has not presented evidence creating a

genuine issue of material fact and that defendant has met its burden of proof as to the

availability of the Burlington/Faragher defense.

**RETALIATION CLAIM**

Title VII "forbid[s] employers from retaliating against an employee when that

employee takes action in opposition to a discriminatory practice."  Timmerman v. U.S.

Bank, N.A., 483 F.3d 1106, 1122 (10th Cir. 2007) (citing 42 U.S.C. § 2000e-3(a)).  "In

order to establish a prima facie case of retaliation, an employee must show that: '(1)

she engaged in protected activity; (2) she suffered an adverse employment action; and

(3) that there was a causal connection between the protected activity and the adverse

action.'" Id. at 1122-23 (quoting Duncan v. Mgr., Dep't of Safety, 397 F.3d 1300, 1314

(10th Cir. 2005)).  Here, the only adverse employment action that occurred after plaintiff

finally complained about the alleged sexual harassment by Martinez was her

termination.  The poor evaluations, her demotion back to AA II, and her performance

improvement plans all occurred prior to her complaint to Trujillo (and prior to the

alleged sexual harassment).  For purposes of its summary judgment motion, defendant

does not dispute that plaintiff could establish a prima facie case of retaliation.

"Similar to a discrimination claim, once the employee establishes a prima facie

case of retaliation, the burden of production shifts to the employer to articulate a

legitimate, nondiscriminatory reason for the adverse employment action."  Id. at 1123

(citation omitted).  Here, defendant has articulated a legitimate, nondiscriminatory

reason for the plaintiff's termination, namely, the overwhelming evidence of the

plaintiff's continued poor performance (including documented errors that exceeded the

number allowed by the settlement agreement) as discussed above.   Therefore, plaintiff

"must then demonstrate that the employer's proffered reason for the adverse action is

pretextual."  Id. (citation omitted).

"A showing of pretext does not require a plaintiff to offer any direct evidence of

actual discrimination. . . .  An employee may show pretext based on 'weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's

claimed legitimate, non-discriminatory reason such that a rational trier of fact could find

the reason unworthy of belief." Id.  There are typically three ways a plaintiff makes a

showing of pretext:

> (1) with evidence that the defendant's stated reason for the adverse
> employment action was false; (2) with evidence that the defendant acted
> contrary to a written company policy prescribing the action to be taken by
> the defendant under the circumstances; or (3) with evidence that the
> defendant acted contrary to an unwritten policy or contrary to company
> practice when making the adverse employment decision affecting the
> plaintiff.  A plaintiff who wishes to show that the company acted contrary
> to an unwritten policy or to company practice often does so by providing
> evidence that he was treated differently from other similarly-situated
> employees who violated work rules of comparable seriousness.

Green v. New Mexico, 420 F.3d 1189, 1193 (10th Cir. 2005) (quoting Kendrick v.

Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000)).

Here, plaintiff contends that the mere timing of her termination one month after

she raised her complaint of sexual harassment is itself sufficient to defeat defendant's

summary judgment motion.  Defendant, however, correctly responds that close

temporal proximity is a factor in showing pretext, but alone it is not sufficient to defeat

summary judgment.  Annett v. University of Kan., 371 F.3d 1233, 1240 (10th Cir. 2004).

Furthermore, as noted by defendant, plaintiff's argument overlooks the reality of the

timing.  The undisputed facts show that plaintiff knew well before the alleged

harassment began that she was in danger of losing her job.  In fact, in November 2002

she asked for a meeting to request time to find another job.  She was even permitted

paid administrative leave for interviews.  Once plaintiff decided not to take the job in

Denver and instead stay in Loveland, Gabel asked Harding to address plaintiff's

performance, and plaintiff was then terminated.

26

Defendant notes that plaintiff contends that the "most telling" regarding the notion that she was performing her job satisfactorily and that defendant's reasons for her termination are pretextual is the fact that Harding, Gabel, and Miller were willing to find her another job within CDOT.   The attempt to help plaintiff get this job in Denver, however, is not pretext for retaliation.  It occurred well before plaintiff engaged in the protected activity.  Furthermore, the evidence shows that the tasks of an AA II and an AA III are significantly broader than those of a data entry position.  Therefore, plaintiff's inability to perform the AA II and III positions satisfactorily does not necessarily mean she could not perform the data entry position that was offered, albeit on a trial basis.

The court does "not ask whether the employer's reasons were wise, fair or correct; the relevant inquiry is whether the employer honestly believed its reasons and acted in good faith upon them."  Riggs v. Airtran Airways, Inc., 497 F.3d 1108, 1118-19 (10th Cir. Aug. 8, 2007).  "The reason for this rule is plain: [the court's] role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." Id.    In addition, "a challenge of pretext requires [the court] to look at the facts as they appear to the person making the decision to terminate the plaintiff."  Kendrick, 220 F.3d at 1231.  In this case, plaintiff has not provided evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief."  Plaintiff has not raised a genuine issue of material fact as to whether defendant's proffered reason for her termination is pretext for retaliation.

27

Consequently, defendant is entitled to summary judgment on plaintiff's claim of retaliation.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that the Defendant's Motion for Summary Judgment (Docket No. 50) is **GRANTED**.  Judgment shall enter in favor of the defendant and against the plaintiff. Defendant may have its costs to be taxed by the Clerk of the Court pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.  It is further

**ORDERED** that the trial preparation conference set on November 16, 2007, at 11:00 a.m. and the trial set on December 10, 2007, at 8:30 a.m. are vacated.  It is further

**ORDERED** that plaintiff's Motion in Limine (Docket No. 71) is denied as moot.


Dated:      October 31, 2007          s/ Michael J. Watanabe
            Denver, Colorado          Michael J. Watanabe
                                      United States Magistrate Judge